CARMI R. ALDEN, administrator, *vs.* NORWOOD ARENA, INC. (and two companion cases[1]).

Norfolk.   November 5, 1954. — February 14, 1955.

Present:   QUA, C.J., RONAN, WILKINS, SPALDING, & WILLIAMS, JJ.

*Negligence,* Automobile race track, Assumption of risk. *Evidence,* Relevancy and materiality. *Conscious Suffering. Damages,* For death, For tort. *Death. Husband and Wife,* Services of wife.

A ruling as matter of law that the risk of being struck by a wheel flying off a car during a "stock car" race at a race track was so open and obvious to patrons of the track injured thereby while watching the race from box seats that the patrons assumed that risk would not have been proper where there was evidence that they had never seen a wheel fly off during races which they had previously attended and that the flying off of a wheel was a somewhat infrequent occurrence. [271]

Evidence showing that the flying off of wheels of cars during "stock car" races at a race track, although occurring infrequently, had occurred on a number of occasions to the knowledge of the proprietor of the track, but not showing that flying off of wheels was a hazard obvious to patrons of ordinary intelligence, warranted a finding of negligence

---

[1] The companion cases are by Helen E. Littlefield and Joan Neilson against the same defendant.

on the part of the proprietor in failing to give any warning of the hazard to a patron having no actual knowledge thereof who was struck and injured by a wheel flying off a car.  [271–272]

At the trial of actions by patrons against the proprietor of an automobile race track to recover for injuries received by the plaintiffs when a wheel flew off a car during a "stock car" race, where the basis of the actions was that the defendant was negligent in failing to warn the plaintiffs of the danger, testimony of representatives of the defendant that they had seen or had knowledge of wheels flying off racing cars on previous occasions and testimony of the plaintiffs that no warning of danger was given by the defendant was properly admitted, and a plan of the track offered by the defendant was properly excluded on the issue of the defendant's negligence.  [272–273]

Testimony by a physician of many years' experience as to the significance of his wife's appearance and behavior during a period of more than a day when, following injuries to her head and neck, she was at a hospital and he was at her bedside almost constantly warranted a finding that she suffered consciously before her death at the end of that period, although he conceded that she was unconscious a great deal of the time; and there was no abuse of discretion on the part of the trial judge in refusing to set aside an award of $7,375 damages for her conscious suffering.  [274, 277]

In an action under G.L. (Ter. Ed.) c. 229, § 2, as appearing in St. 1947, c. 506, § 1A, for the death of the wife of a practising physician who maintained a household in which he, his wife and a son dwelt, evidence that the wife regularly performed all the household duties, "kept the telephone covered for . . . [her husband] in connection with his practice as a physician," made appointments for him and informed persons where to find him warranted a finding that the husband sustained "pecuniary loss" greater than the $2,000 minimum specified in the statute although the wife's services were gratuitous and for the most part she depended on him for support; and there was no abuse of discretion on the part of the trial judge in refusing to set aside an award of $10,200.  [274–277]

THREE ACTIONS OF TORT.  Writs in the Superior Court dated November 2, 1949, January 19, 1950, and March 17, 1950.

The actions were tried before *Donahue*, J.  In the action by Carmi R. Alden, administrator of the estate of his wife, verdicts were returned for the plaintiff in the sum of $10,200 on a count for the death of his wife and in the sum of $7,375 on a count for her conscious suffering.  Verdicts were returned for the other plaintiffs.  Motions for a new trial by the defendant were denied.  The defendant alleged exceptions.

*Joseph F. Dolan,* for the defendant.

*Samuel P. Sears, (Lawrence R. Cohen, Michael T. Prendergast & Roger F. Turner* with him,) for the plaintiffs.

SPALDING, J.    The defendant, a corporation, owns and operates an arena in Norwood where so called "stock car" races are conducted.   On the evening of September 24, 1949, the plaintiffs Littlefield and Neilson and the plaintiff Alden and his wife went to the arena to see the races.   They purchased tickets for the box seat section.   Alden and his wife and the plaintiff Neilson sat in either the fourth or the fifth row of boxes and the plaintiff Littlefield sat forty or forty-five feet away from them.

During one of the races as "the cars came into the last turn a sort of gasp went up from the crowd" and the plaintiff Alden observed a wheel in the air.   Believing it was going to strike his group, he yelled to them "to duck." "[A]ll ducked and all came up except Mrs. Alden."   She was struck by the wheel on the side of the head and neck and from these injuries she died two days later.   She was survived by her husband and a son and will be referred to hereinafter as the deceased.   The plaintiffs Neilson and Littlefield were also injured.

From the accident described above these three actions of tort arose.   The plaintiffs Neilson and Littlefield each bring an action to recover for personal injuries sustained by them. The plaintiff Alden as administrator of his wife's estate sues to recover for her death and conscious suffering.   Verdicts for the plaintiffs were returned and the cases come here on various exceptions taken by the defendant.

1. The defendant's exceptions to the denial of its motions for directed verdicts on the issue of negligence must be overruled.   A summary of the pertinent evidence is as follows: Inside the arena is a canted, elliptically shaped track of about one eighth of a mile.   There is a grandstand surrounding most of the track which accommodates 14,000 to 15,000 spectators.   The track is completely surrounded by a chain link fence eight feet high which rests on an embankment four to five feet high, and there is a guard rail between

the track and the fence. The height of the fence in front of the reserved or box seat section is twelve feet from the level of the track. The distance from the outside edge of the track to the first tier of box seats is fifteen to twenty feet.

This was the second year that races had been conducted at the arena. Racing took place three or four nights a week with eight to ten races a night over a period of five or six months. Four to twenty cars participated in each race. Accidents and collisions of the automobiles were a nightly occurrence. Alden had attended the races about fifteen times and on three or four occasions his wife had accompanied him. Both had observed accidents resulting from collisions but neither had ever seen "a wheel go into the bleachers, barriers or fly into the crowd, or fly over the bleachers." The plaintiffs Neilson and Littlefield had each attended the races once prior to September 24, 1949, but neither had seen a wheel come off a racing car.

One Fay, who was employed by the defendant as supervisor of the arena, testified that he had been working for the defendant for about three years in that capacity and that this was the first time he had ever seen a wheel go into the box seats, but prior to the accident he had observed twelve to fifteen wheels come off racing cars and hit the guard rail or fence; that on two occasions he had seen wheels go over the bleachers and completely out of the track; and that he saw some go into the crowd.

An officer of the defendant testified that prior to the accident he had seen one wheel come off and go into the bleachers or unreserved section. He further stated that he had received reports from employees of the defendant that "wheels came off stock cars and had gone into the crowd eight to ten times prior to the Alden accident."

One witness estimated that the wheel that caused the accident cleared the fence in front of the boxes at a height of fifty feet. No warning of any sort concerning the danger from flying wheels was given to patrons of the arena.

The duty owed to invitees by one who operates a place of

amusement has been set forth in several decisions. *Shanney*
v. *Boston Madison Square Garden Corp.* 296 Mass. 168.
*Lemoine* v. *Springfield Hockey Association, Inc.* 307 Mass.
102, 104. *Katz* v. *Gow,* 321 Mass. 666. *Shaw* v. *Boston
American League Baseball Co.* 325 Mass. 419. The rule de-
ducible from these decisions is that the proprietor of a
place of amusement owes to his patrons the duty to use due
care to see that his premises are reasonably safe for the
intended use or to warn them of dangers which are not
obvious. But as to dangers of which the patrons have
knowledge, or which are obvious to a person of ordinary in-
telligence, there is no duty to warn. Thus in *Shaw* v.
*Boston American League Baseball Co.* it was held that a
spectator at a baseball game who was familiar with the
game assumed the reasonable risks and hazards inherent
in it, and one of those hazards was the possibility of being
hit by a foul ball. To the same effect is *Katz* v. *Gow,* 321
Mass. 666, where it was held that a patron at a driving
range assumed the risk of being hit by a golf ball.

The defendant argues that each of the spectators here
involved assumed the risk of being hit by a flying wheel as
an incident inherent in the sport of automobile racing and
as a risk obvious to a person of ordinary intelligence. We
do not agree. While the deceased and the plaintiffs Neil-
son and Littlefield were not unfamiliar with stock car rac-
ing, the jury could have found that none of them had ever
seen a wheel fly off during a race. And the evidence falls far
short of showing that this was a hazard which was so open
and obvious that as matter of law they must be taken to have
assumed it. On the contrary the evidence shows that the
flying off of a wheel was a somewhat infrequent occurrence.

But that is not an end of the matter. The defendant was
not an insurer, and to recover the plaintiffs must show some
breach of duty on the part of the defendant. The plaintiffs
do not contend that the defendant ought to have taken
greater precautions by way of screens, fences, or guard rails
than it did. The breach of duty on which the plaintiffs rely
was the failure of the defendant to warn of the danger.

There was no such warning here and we are of opinion that the defendant could have been found to be negligent in this respect. It is true that the flying off of a wheel did not happen with great frequency but it was by no means an isolated or highly improbable occurrence. Compare *Hall* v. *Brooklands Auto Racing Club*, [1933] 1 K. B. 205. The jury could have found that the danger was such that the defendant should have anticipated it and given suitable warning. See *Kushner* v. *McGinnis*, 289 Mass. 326; Restatement: Torts, § 343. If despite such warning persons saw fit to attend the races, then they assumed the risk of being hit by a flying wheel. Volenti non fit injuria.

2. The defendant's exceptions to rulings on evidence may be briefly disposed of. The testimony of Fay and Forrest, employee and officer respectively of the defendant, to the effect that they had seen or had knowledge of wheels flying off racing cars on other occasions, was clearly admissible to prove that the defendant knew of the dangers to which its spectators were subjected. The testimony of the plaintiffs Alden and Littlefield that no warnings of the dangers from wheels flying off were given by the defendant was likewise admissible since the plaintiffs' contention is that the defendant had a duty to warn and was negligent in failing to do so.

The defendant offered in evidence a plan of the race track which had been approved by the department of public safety. No question was raised as to the authenticity or correctness of the plan but its admissibility was challenged by the plaintiffs. The judge stated that he would admit it as a plan of the track. Counsel for the defendant stated that he desired to offer it on the issue of due care. The plaintiffs' counsel then stated that they did not contend that there was any violation of law with respect to the track but based their cases on common law negligence. There was no error. The defendant was given an opportunity to put in the plan to show the layout of the track and declined to avail itself of it. Inasmuch as no contention was being made that the track was improperly constructed

or did not conform to the law, it is difficult to see how it had any relevancy on the issue of negligence.

3. The defendant urges that, apart from the question of negligence, it was entitled to a directed verdict on the count for conscious suffering in the action brought by the administrator of the deceased. The evidence material to this issue was as follows: Following the accident the deceased was taken to the Norwood Hospital. The next day, September 25, 1949, at 11 A.M. she was transferred to the Boston City Hospital. She lived until 2 P.M. on September 26. The deceased's husband was a physician. While the deceased was at the Boston City Hospital her husband was almost constantly at her bedside. He testified that she showed signs of consciousness in the following manner: He "took her hand and would hold her hand and sit beside her bed. He would put his lips down close to her ear and repeat two short phrases over and over. Her mouth was badly battered and she couldn't speak but she would squeeze his hand many times. The whispering in the ear occurred many times and the response was four times." When asked what he saw that he thought would indicate his wife was suffering the witness said that he observed the expression on her face, the way she was breathing, the color of her skin, and "movements, such as they were." The following excerpt from the hospital record was read to the witness, "She responds to pin prick only and by withdrawal slowly," and he was asked what it indicated. The witness answered, "That means if you stick a pin into her she would pull her hand away from it." He further stated that he was present when pin-prick tests were performed and the "response was a squirming . . . to get away from it." She also groaned occasionally. The witness conceded that a person could withdraw from pin pricks involuntarily. He also conceded that his wife was unconscious a great deal of the time. The "admission and discharge summary" in the hospital record contained an entry that the deceased "was immediately rendered unconscious [by the accident] and has remained so since then."

The question whether there was any evidence of conscious suffering to go to the jury is very close. There are decisions in which groans, responses, and movements are considered as equally consistent with consciousness as unconsciousness. *Melnik* v. *Perwak*, 295 Mass. 512. *Allison* v. *Sessa*, 302 Mass. 302. See *Battany* v. *Wall*, 232 Mass. 138; *Nadeau* v. *Taunton*, 247 Mass. 104, 106; *Isaacson* v. *Boston, Worcester & New York Street Railway*, 278 Mass. 378. But considering the fact that Dr. Alden was a physician of many years' experience, we think that his testimony as to the significance of his wife's appearance and behavior was enough to warrant the judge in submitting the case to the jury.

4. In the action for death and conscious suffering the defendant presented a motion for a new trial which the judge denied subject to the defendant's exception. Several grounds were set forth in the motion but the only ground on which the exception is based is that relating to excessive damages. The verdict on the count for death was $10,200. The defendant concedes that as a general rule the granting of a motion for a new trial on the ground of excessive damages rests largely in the discretion of the trial judge and that his action in refusing to set aside a verdict will be upheld unless there was an abuse of discretion amounting to an error of law. See *Bartley* v. *Phillips*, 317 Mass. 35, 40–44, where the subject is exhaustively discussed. The defendant argues that on the count for death there was no evidential support for the verdict returned by the jury; that at the very most the verdict should not have exceeded the minimum amount permitted by the statute in force at the time of accident; and that in allowing the verdict of $10,200 to stand there was an abuse of discretion on the part of the trial judge.

The death statute in force at the time of the accident was G. L. (Ter. Ed.) c. 229, § 2, as appearing in St. 1947, c. 506, § 1A, which, so far as here material, reads, "if any person . . . causes the death of a person in the exercise of due care . . . he . . . shall be liable in damages, in an amount not less than two thousand nor more than fifteen thousand

dollars, to be assessed with reference to the pecuniary loss sustained by the parties entitled to benefit hereunder . . . and distributed one half to the surviving wife or husband and one half to the children of the deceased dependent upon him for support at the time of his death, or, if there are no such dependent children, to the surviving wife or husband, or, if there is no surviving wife or husband, to the next of kin." [1]

If no "pecuniary loss" within the meaning of the statute was established then the recovery should have been $2,000. *Beatty* v. *Fox*, 328 Mass. 216. Since it was not shown that the son of the deceased was dependent on his mother for support at the time of her death, we assume that damages were awarded only on the basis of the loss to the surviving spouse. The question for decision, then, is whether the husband of the deceased sustained any pecuniary loss within the meaning of the statute. He contends that he has sustained such a loss by reason of being deprived of his wife's services in connection both with his home and with his practice.

The Alden household at the time of the accident comprised three persons, the deceased and her husband, Dr. Alden, and a son who was at the time of trial also a physician. The deceased had no outside employment. She had a small amount of income of her own but for the most part she depended on her husband for support. At her death the deceased was fifty-three years of age. She performed all the household duties such as taking care of the house, cooking, and mending. She also "kept the telephone covered for . . . [her husband] in connection with his practice as a physician." When he would be in the back yard or out in the evening she would answer the telephone. She also had made appointments for her husband and informed persons where to find him as she knew of his whereabouts twenty-four hours a day.

---

[1] See now G. L. (Ter. Ed.) c. 229, § 2C, inserted by St. 1949, c. 427, § 3, whereby the degree of culpability of the defendant is restored as the measure of damages.

Whether the loss of services of this sort constitutes "pecuniary loss" as those words are used in the statute has never been decided. Whatever the rule may have been formerly, a wife today by reason of statutes enlarging the rights of married women is under no legal duty to perform services for her husband; her time and her ability to work are her own. *Harmon* v. *Old Colony Railroad*, 165 Mass. 100, 105. *Rodgers* v. *Boynton*, 315 Mass. 279, 281. See G. L. (Ter. Ed.) c. 209, § 4. If a wife suffers an injury through the tortious conduct of a third party, she can recover for the loss of her ability to work whether or not she was in fact gainfully employed. *Matloff* v. *Chelsea*, 308 Mass. 134, 136. And she is entitled to have considered in the assessment of damages her inability, due to the injury, to perform her household duties. *Rodgers* v. *Boynton*, 315 Mass. 279, 281–282. But a husband cannot recover for the loss of his wife's earning capacity or for being deprived of her assistance in the performance of household services; nor can he recover for the cost of having another perform such services while his wife is incapacitated. *Rodgers* v. *Boynton*, 315 Mass. 279, 282–283. If the rule were otherwise there would be a double recovery. The wife could recover for her loss of earning capacity including the loss of her ability to perform household duties and the husband could also recover for this loss.

The principles just discussed are those which govern today in actions at common law. The right to recover for death is entirely statutory and the damages recoverable are specified in the statute. General Laws (Ter. Ed.) c. 229, § 2, as appearing in St. 1947, c. 506, § 1A, provides that the person causing death "shall be liable in damages, in an amount not less than two thousand nor more than fifteen thousand dollars, to be assessed with reference to the *pecuniary loss* sustained by the parties entitled to benefit hereunder" (emphasis supplied).

Thus far only three cases involving damages under this statute have been before this court. *Beatty* v. *Fox*, 328 Mass. 216. *Hanlon* v. *White Fuel Corp.* 328 Mass. 455.

*Durdle* v. *Baron*, 328 Mass. 460. Of these only the *Durdle* case sheds any light on the problem here involved. In that case the deceased was survived by three adult daughters and by three children of a deceased daughter. There was no evidence that any of them were dependent upon him for support. There was evidence, however, that he was on friendly terms with his daughters and frequently gave them sums of money. We held that those gifts properly could be considered by the jury in determining the pecuniary loss of the daughters occasioned by the death of their father. We think that this case is authority for allowing the plaintiff Alden to recover for loss of his wife's services as a "pecuniary loss" sustained by him. To be sure the services were gratuitous and he had no legal right to them. But that was also true of the gifts of money to the daughters in the *Durdle* case. The deceased regularly contributed her services to her husband and would doubtless have continued to do so. And there is not here as in common law damages, discussed above, any danger of double recovery if the husband should recover for these services. It follows that the jury were not limited to bringing in a verdict of $2,000. We cannot say that either on the count for death or on the count for conscious suffering the damages were " 'greatly disproportionate to the injury proved.' " *Bartley* v. *Phillips*, 317 Mass. 35, 41. Accordingly the exception to the denial of the motion for a new trial is overruled.

*Exceptions overruled.*